**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| JEFF BLEDSOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:26-mc-9999 |
| v. | ) | |
| | ) | **JURY DEMAND** |
| TENNESSEE SHERIFFS' ASSOCIATION, INC. RUSSELL BARKER, individually; and MIKE VAN DYKE, individually. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Jeff Bledsoe ("Plaintiff" or "Mr. Bledsoe"), by and through undersigned counsel, files this Complaint against Defendants Tennessee Sheriffs' Association, Inc. (the "Association," or "TSA"), Russell Barker ("Barker"), and Mike Van Dyke ("Van Dyke") (Barker and Van Dyke, together, the "Individual Defendants"; TSA and the Individual Defendants, collectively, "Defendants"), and states as follows:

## I. NATURE OF THE ACTION

1. This is an action for unlawful retaliation, disability discrimination, deprivation of property without due process of law, and breach of contract, and inducement of breach of contract arising from TSA's termination of Mr. Bledsoe, its Executive Director, on or about October 9, 2025.

2. Mr. Bledsoe is a career law enforcement officer and former Sheriff who was hired as the Association's Executive Director on or about June 3, 2020, and served as the Association's Executive Director beginning in or around July 2020. In or around March 2025, the Association's

membership unanimously voted to retain him for an additional two-year term pursuant to the Association's Constitution. The Association's Board of Directors also approved a salary increase for him for fiscal year 2026 in or around September 2025, less than a month before his termination.

3. Throughout his tenure, Mr. Bledsoe refused to remain silent about illegal activities, including the false certification of attendance at state-mandated law enforcement training and the receipt of undisclosed vendor gifts by Sheriffs and Board members. In April 2025, he also terminated the Association's office manager for displaying sexually explicit content during a virtual Board meeting.

4. Following that protected conduct, certain Board members orchestrated a campaign to remove Mr. Bledsoe through secret meetings from which he was excluded, manufactured and stale grievances, and the wholesale disregard of the Association's own governing documents. They then terminated him while he was on medical leave, without the general-membership vote, notice, cause, or hearing that the Association's Constitution, Bylaws, and Personnel Policy and Procedure Manual require. Defendant Barker, TSA's President, and Defendant Van Dyke, its First Vice President, who succeeded Mr. Bledsoe as Interim Executive Director, personally participated in carrying out that termination.

5. Mr. Bledsoe brings claims under the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 ("TPPA"); 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103 ("TDA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Tennessee Human Rights Act, Tenn.

Code Ann. § 4-21-101 *et seq.* ("THRA"); Tenn. Code Ann. § 47-50-109; and Tennessee common law.

## II. PARTIES

6. Plaintiff Jeff Bledsoe is an adult citizen and resident of Dickson County, Tennessee. He was born in 1967 and was approximately fifty-eight years old at the time of his termination.

7. Defendant Tennessee Sheriffs' Association, Inc. is a Tennessee nonprofit corporation, recognized as tax-exempt under Section 501(c)(3) of the Internal Revenue Code, with its principal office at 145 South College Street, Lebanon, Wilson County, Tennessee 37087. TSA may be served through its registered agent, itself—Tennessee Sheriffs' Association, Inc., at 145 South College Street, Lebanon, Wilson County, Tennessee 37087.

8. TSA's active membership is composed of the elected Sheriffs, Deputies, and Jail Administrators of Tennessee's ninety-five counties, with each county paying membership dues. Citizens join as honorary members in support of TSA projects and activities and pay membership dues. TSA's Board of Directors is composed entirely of sitting Sheriffs, and its business is carried out by an Executive Director under the supervision of the Board. Further, TSA employed additional staff to carry out its operations.

9. Defendant Russell Barker is an adult citizen and resident of Anderson County, Tennessee, and is the elected Sheriff of Anderson County, Tennessee. At all relevant times, Barker served on TSA's Board of Directors; he was TSA's First Vice President and President-Elect until in or about July 2025, and its President thereafter. Barker is sued in his individual capacity.

10. Defendant Mike Van Dyke is an adult citizen and resident of Robertson County, Tennessee, and is the elected Sheriff of Robertson County, Tennessee. At all relevant times, Van Dyke served on TSA's Board of Directors; in or about July 2025, he became TSA's First Vice President; and, following Mr. Bledsoe's termination, he was appointed TSA's Interim Executive Director. Van Dyke is sued in his individual capacity.

## III. JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343(a), 42 U.S.C. § 2000e-5(f)(3), and 42 U.S.C. § 12117(a).

12. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as the federal claims and form part of the same case or controversy under Article III of the United States Constitution.

13. Venue is proper in this District and Division under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because all Defendants reside in Tennessee and TSA resides in this District, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, the unlawful employment practices alleged herein were committed in this District, and Plaintiff's employment records are maintained in this District. Wilson County and Dickson County lie within the Nashville Division of the Middle District of Tennessee. *See* 28 U.S.C. § 123(b)(1).

## IV. ADMINISTRATIVE PREREQUISITES

14. On July 24, 2026, Plaintiff signed and filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 494-2026-04631, alleging retaliation and disability discrimination (actual and perceived) by TSA (the "Charge").

15. The Charge identified the Civil Rights Enforcement Division of the Tennessee Attorney General's Office ("CRED") as the state agency, and Plaintiff expressly requested that the Charge be filed with both the EEOC and CRED.

16. CRED is the state agency charged with enforcing the THRA and the TDA and has authority to grant or seek relief from the practices alleged herein. Accordingly, the 300-day charge-filing period of 42 U.S.C. § 2000e-5(e)(1), incorporated into the ADA by 42 U.S.C. § 12117(a), applies, and the Charge was timely filed within 300 days of Plaintiff's October 9, 2025 termination.

17. On August 18, 2026, the EEOC issued Plaintiff a Determination and Notice of Rights, including a notice of his right to sue. Plaintiff received the Notice on or about August 18, 2026. A copy of the Notice is attached as **Exhibit 1**.

18. Plaintiff has filed this action within ninety (90) days of his receipt of the Notice of Right to Sue.

19. Plaintiff's claims under the TPPA, THRA, TDA, 42 U.S.C. § 1983, Tenn. Code Ann. § 47-50-109, and Tennessee common law do not require administrative exhaustion.

20. All conditions precedent to the filing of this action have been performed, have occurred, or have been excused. *See* Fed. R. Civ. P. 9(c).

## V. COVERAGE

21. At all relevant times, Plaintiff was an "employee" of TSA within the meaning of 42 U.S.C. § 2000e(f), 42 U.S.C. § 12111(4), Tenn. Code Ann. § 4-21-102, and Tenn. Code Ann. § 50-1-304.

22. At all relevant times, TSA was an "employer" within the meaning of 42 U.S.C. § 2000e(b) and 42 U.S.C. § 12111(5)(A), in that it was engaged in an industry affecting commerce

and upon information and belief, employed fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

23. At all relevant times, TSA was an "employer" within the meaning of the THRA, Tenn. Code Ann. § 4-21-102, in that it, upon information and belief, employed eight (8) or more persons within Tennessee, and was an "employer" within the meaning of the TDA.

24. At all relevant times, TSA was an "employer" within the meaning of the TPPA.

## VI. FACTUAL ALLEGATIONS

### A. Mr. Bledsoe's Career and Employment with the Association

25. Mr. Bledsoe has served in law enforcement throughout his professional career, beginning in 1986. Before joining the Association, he served as the elected Sheriff of Dickson County, Tennessee. Mr. Bledsoe has received awards at the local, state, and national levels. For instance, TSA named Mr. Bledsoe the 2018 Sheriff of the Year.

26. On or about June 3, 2020, after a unanimous vote by member sheriffs present, the Association hired Mr. Bledsoe as its Executive Director. In accepting the position of TSA Executive Director, Mr. Bledsoe notified the Dickson County mayor and legislative body, and later retired from the office of Sheriff.

27. The terms of Mr. Bledsoe's employment were set forth in the Association's Constitution, Bylaws, and Personnel Policy and Procedure Manual (collectively, the "Governing Documents").

28. Article XI of the Association's Constitution governs the Executive Director's position. Article XI, Section B provides for a biennial Vote of Confidence in the Executive Director by the membership. Article XI, Section D provides: "The Executive Director may be

terminated for cause at any meeting of the general membership by a majority vote of the active membership present."

29. Mr. Bledsoe relied on the employment protections of Article XI, including the requirements that any termination be for cause and be effected by a majority vote of the general membership, in accepting the Executive Director position and retiring from his office as Sheriff.

30. Mr. Bledsoe also served on the Association's Board of Directors and all standing Association committees during his tenure.

31. Throughout his tenure, Mr. Bledsoe performed his duties professionally and diligently, serving in multiple state and national organizations and representing sheriffs at both levels.

32. In or around March of 2025, the Association conducted its biennial Vote of Confidence in the Executive Director pursuant to Article XI, Section B[1]. Every member present voted to retain Mr. Bledsoe for an additional two-year term, and many member Sheriffs approached Mr. Bledsoe to congratulate him and thank him for his service with TSA.

33. Thereafter, the Board approved an annual salary increase for Mr. Bledsoe for fiscal year 2026. At the time of his termination, Mr. Bledsoe's annual salary was $173,475.00, and he also received employment benefits including, but not limited to, retirement contributions, accrued annual and sick leave, use of an Association vehicle, longevity benefits, and other benefits.

34. Before his termination, Mr. Bledsoe received no written discipline, no performance evaluation/improvement plan, and no documented, contemporaneous communication of any performance deficiency.

---

[1] Article XI - Executive Director, Section B: "A vote of confidence shall be conducted every two years at the next regular meeting following the anniversary date of employment of the Executive Director."

**B. The Association's Connection to the State of Tennessee**

35. The Association's active members include the elected Sheriffs of Tennessee's counties, who are constitutional officers of the State and its political subdivisions. Its Board of Directors consists entirely of sitting Sheriffs who serve on the Board by virtue of their public office. The State of Tennessee recognizes TSA as similar to a political subdivision. For instance, the Association is a participating employer in the Tennessee Consolidated Retirement System. *See* Tenn. Code Ann. § 8-35-501. TSA employees are permitted to receive retirement membership benefits in the same manner as employees of local governments participating in the retirement system. *See* Tenn. Code Ann. § 8-35-502[2]. TSA was also approved to purchase under state contract pricing.

36. The Association performs functions that are integral to the statutory training and certification of Tennessee Sheriffs. Every newly elected Sheriff must complete the Newly Elected Sheriffs' School, and thereafter forty (40) hours of annual in-service training, or forfeit the power of arrest. *See* Tenn. Code Ann. § 8-8-102(c)(1)[3].

37. Tenn. Code Ann. § 8-8-102(c)(2) further provides that the newly elected sheriffs' school is taught in cooperation with the Tennessee Sheriffs' Association and must be approved by the Tennessee Peace Officer Standards and Training Commission ("POST") and the Tennessee Corrections Institute (“TCI”). The Association's Executive Director presents the Newly Elected Sheriffs' School in partnership with the Tennessee Law Enforcement Training Academy, TCI, and the University of Tennessee County Technical Assistance Service ("CTAS"), and conducts

---

[2] Tenn. Code Ann. § 8-35-502(a): "The employees of the [Tennessee Sheriffs' Association] shall make the same contributions, participate in the same manner, and shall be eligible for the same benefits as employees of local governments participating in the retirement system."

[3] Tenn. Code Ann. § 8-8-102(c)(1): "Every person who is elected or appointed to the office of sheriff after May 30, 1997, shall, annually during the sheriff's term of office, complete forty (40) hours of in-service training appropriate for the rank and responsibilities of a sheriff. The training shall be approved by the POST commission. Any sheriff who does not fulfill the obligations of this annual in-service training shall lose the power of arrest."

annual training through which Sheriffs satisfy state training requirements, in compliance with section 5.7[4] of TSA Bylaws.

38. The Association submits each training agenda to POST and TCI for approval of scheduled training. Sheriffs certify their attendance at Association training through attendance sign-in forms and training-credit forms. Those attendance records are reported to and maintained by POST and TCI, and completion of the required training is tied to an annual state salary supplement paid to Sheriffs. *See* Tenn. Code Ann. § 38-8-111 ("police officers are eligible for the pay supplement upon successful completion of forty (40) hours of the in-service training").

39. The Association is funded in part with public money. Tenn. Code Ann. § 40-38-505 authorizes the Department of Finance and Administration, Office of Criminal Justice Programs, to make an annual grant to the Association to fund, implement, and manage the State's automated victim notification system ("TN SAVIN"). Upon information and belief, the Association receives that grant, and its member Sheriffs' counties pay membership dues and training costs with public funds.

40. TSA does not merely receive these public funds; it operates the State's victim notification program. TSA employs dedicated staff, including a SAVIN & VINE Court Director, supervised by the executive director, to administer TN SAVIN and VINE Courts on the State's behalf. Through TN SAVIN, TSA carries out a function the State has undertaken to perform for crime victims: notifying them of the custody status, release, or escape of offenders and of the court events through the court notification system.

---

[4] Section 5.7 Executive Director, Subsection E: "The duties of the Executive Director shall [include]: To work in close cooperation with the Director of the Tennessee Law Enforcement Training Academy, P.O.S.T. Commission, County Technical Assistance Service, the Tennessee Highway Patrol, the Tennessee Bureau of Investigation, [and] other state agencies as directed by the Board and the Tennessee General Assembly";
Section 5.7 Executive Director, Subsection F: "The duties of the Executive Director shall [include]: To set up a 'New Sheriffs' school following each election before new sheriffs take office."

41. In performing that function, TSA acts as the State's agent in discharging a public obligation that Tennessee has assumed by constitutional and statutory command, using public funds and a dedicated staff position created for that purpose, including support staff of the Association.

42. Because the Association is controlled by public officials acting in their official capacities, performs functions integral to the State's statutory training regime, administers the State's constitutionally grounded victim and court notification program through dedicated staff, is funded in part by the State, and receives state benefits, the Association is pervasively entwined with the State and its political subdivisions, and its actions, including the termination of Mr. Bledsoe, constitute action under color of state law. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001)("[when] the nominally private character of [a] Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings . . . there is no substantial reason to claim unfairness in applying constitutional standards to it").

**C. Mr. Bledsoe Refuses to Remain Silent About Illegal Activities**

43. **False certification of mandatory training attendance.** During his tenure, Mr. Bledsoe learned that members were submitting training-credit forms certifying attendance at Association training sessions they had not attended. Sheriffs could routinely be seen outside the classroom, in common areas, or outside smoking and talking, while sessions were underway, and final sessions were frequently attended by only about half of those registered. Mr. Bledsoe addressed all members present in at least one training session, since it was noticeable. Bledsoe emphasized ensuring all members attend the classes they mark on the training credit forms.

Bledsoe discussed how easy it would be to witness and video Sheriffs outside of class, and to request hotel security video to show absences or departures from training.

44. False certification of attendance at state-mandated training is illegal. Upon information and belief, it may constitute, among other things, official misconduct, Tenn. Code Ann. § 39-16-402; tampering with or fabricating governmental records, Tenn. Code Ann. § 39-16-504; and theft, Tenn. Code Ann. § 39-14-103, to the extent it results in payment of a state salary supplement that was not earned. In Tennessee, law enforcement personnel, including sheriffs' employees, have been arrested and charged with such offenses in connection with false training reports.

45. Mr. Bledsoe did not remain silent. He directed a change in Association procedure so that training-credit forms were held until the last day of training, and he repeatedly advised the membership that only the attending member may sign in and that no one may sign in on another member's behalf. Bledsoe addressed the members present at a training session, explaining that if the state audits training records, it can compare signatures on the sign-in forms with the known signatures of the attending sheriffs to ensure accuracy.

46. The misreporting nonetheless continued. Shortly before Mr. Bledsoe's termination, a Sheriff asked Bledsoe whether the Sheriff could still receive credit because the Sheriff's employee, a member of the Sheriff's command staff, failed to sign the Sheriff in. At the time of his termination, Mr. Bledsoe was addressing this incident and the continued misreporting by Sheriffs.

47. **Undisclosed vendor gifts.** Mr. Bledsoe also became aware of, and raised concerns about, a longstanding practice whereby vendors provided undisclosed gifts, meals,

alcoholic beverages, entertainment, and other things of value to participating Sheriffs and Board members during and around Association meetings and events.

48. Among other things, vendors paid the entry and playing costs for participating Sheriffs in the golf tournament held at the Association's annual summer conference, and witnesses and records of the players, teams, and revenue received exist. Mr. Bledsoe personally observed Sheriffs meeting with and departing alongside vendors at Association meetings and following training sessions, and Sheriffs admitted they were leaving to dine with those vendors. It was further represented that vendors offered to host or assist with campaign fundraising for certain Sheriffs.

49. Mr. Bledsoe reasonably believed that the receipt and non-disclosure of such gifts constituted illegal activities and violated Tennessee law governing the ethical conduct of, and disclosures by, public officials, including, *inter alia*, Tenn. Code Ann. § 8-17-101 *et seq.* and applicable county ethics policies adopted thereunder, and he raised these concerns to protect the Association from the resulting conflicts of interest. Upon information and belief, despite raising these concerns, Association members have never discussed or requested disclosure forms or filed them with their county clerks to guide other members on legal requirements.

50. Mr. Bledsoe communicated his concerns about these illegal activities directly to Board members and Sheriffs and through official Association meeting processes. He also arranged on multiple occasions for CTAS to present ethics training to the membership during annual training sessions and at the Newly Elected Sheriffs' School, and he instructed the Sheriffs on lawful and ethical conduct in training sessions and in email correspondence to all ninety-five counties.

51. Mr. Bledsoe also enforced the Association's contractual obligations to host hotels, including by ending late-night gambling-style card games and vendor bars in the hospitality room. In 2023, Bledsoe addressed the membership about serious violations at the Association's annual conference, including trespassing and the unauthorized service of alcoholic beverages in a closed hotel restaurant in a manner that violated state law and jeopardized the hotel's liquor license. Certain Board members and Sheriffs met Bledsoe's refusal to stay silent with visible displeasure and snide remarks.

52. Mr. Bledsoe's refusals to remain silent about illegal activities were known to TSA's Board members, including the Board members who later orchestrated and effected his termination.

**D. Mr. Bledsoe Terminates the Office Manager for Displaying Sexually Explicit Material**

53. In or around April 2025, the Association's office manager displayed sexually explicit, adult content to attendees during a virtual meeting of the Association's Board of Directors.

54. Mr. Bledsoe reasonably and in good faith believed that the display of sexually explicit material to coworkers and Board members in the workplace constituted sex-based harassment and conduct that, if tolerated, would create a hostile work environment in violation of Title VII and the THRA. He terminated the office manager in opposition to that conduct, consistent with Association policy and within his authority as Executive Director, with the support of then-President Sheriff Jeff Cassidy and other Board members.

55. At Mr. Bledsoe's request, and with Board approval of the expense, the Association engaged an outside firm to conduct a forensic examination of Association devices. The examination uncovered evidence of numerous additional instances in which the former office

manager accessed or stored adult and pornographic content on Association time, property, and equipment. The findings prompted a forensic audit of the Association's financials and interviews with current and former employees who had worked with the office manager.

56. Mr. Bledsoe was then excluded from the forensic audit investigation that followed. The Association's attorney advised Mr. Bledsoe that he wished to interview him. Mr. Bledsoe promptly provided his availability and contact information but never heard back.

57. Immediately thereafter, certain Board members, acting individually and through Sheriff Andy Dickson, who frequently advanced the Board members' positions, began using the office manager's termination as a vehicle to attack Mr. Bledsoe. At a Board meeting, in person and virtually, in or about April 2025, Sheriff Dickson publicly confronted Mr. Bledsoe about the termination in a hostile and disruptive manner, becoming so agitated that he acknowledged needing to calm himself to avoid a medical episode. Other members spoke in support of Mr. Bledsoe's decision.

**<u>E. The Coordinated Campaign to Remove Mr. Bledsoe</u>**

58. Following Mr. Bledsoe's protected conduct, and accelerating after the office manager's termination, certain Board members, individually and through Sheriff Dickson, engaged in a coordinated course of conduct to marginalize, discredit, and remove Mr. Bledsoe.

59. That conduct included excluding Mr. Bledsoe from meetings integral to his role; conducting undisclosed meetings among Board members in violation of the Bylaws; advancing changes to governance procedures designed to shift authority to terminate the Executive Director from the general membership to the Board, contrary to Article XI(D) of the Constitution; and manufacturing pretextual grievances. Mr. Bledsoe spoke by phone with TSA Past President and Board member Sheriff John Fuson regarding Bledsoe's exclusion from board meetings, during

which Bledsoe stated that the Association's conduct violated TSA Governing Documents. Sheriff Fuson's response was "you work for the board," to which Mr. Bledsoe responded that Bledsoe himself *was* a Board member also and reiterated that the Board works for all Sheriffs.

60. At the Association's summer conference in or about July 2025, after the election of the incoming Board for fiscal year 2026, the Board convened an unscheduled meeting. Mr. Bledsoe, though a sitting Board member, was told to step out because the meeting was for Sheriffs only. Upon information and belief, the meeting was led principally by Association President-Elect/1st Vice President, Sheriff Russell Barker, and attempts were made during it to attack Mr. Bledsoe's reputation and character.

61. One Sheriff later described the meeting to Mr. Bledsoe as a "witch hunt," and another assured him that he "had [his] back." A state employee told Mr. Bledsoe that he had been told certain Sheriffs had planned the meeting well in advance.

62. When Mr. Bledsoe raised his concerns with President Jeff Cassidy, Cassidy stated that the meeting's purpose was to ensure that all Sheriffs understood the reasons for the office manager's termination, and that is when the discussion "took a turn" toward attacking Mr. Bledsoe. In further response to Bledsoe's concerns, Cassidy told Mr. Bledsoe "not to worry about any of that stuff." Mr. Bledsoe was the official who terminated the office manager and prepared all of the Association's documentation of that termination, and there was no legitimate reason to exclude him from a meeting convened to explain his own decision.

63. In or about July of 2025, in accordance with the Association annual Board change for the fiscal year of 2026, President Sheriff Jeff Cassidy became the Immediate Past President, and 1st Vice-President Sheriff Russell Barker became President, and Sheriff Mike Van Dyke became 1st Vice President.

64. Among the manufactured grievances against Bledsoe, at a second Board meeting in or about September of 2025, Sheriff Dickson confronted Mr. Bledsoe in a hostile manner about hand-corrected figures on a draft financial document. The documents were reviewed and approved by TSA financial advisor—retired Sheriff Mike Wilson—prior to delivering for the meeting, handwritten corrections on working drafts are standard practice, and no final approved version contained any error. Mr. Bledsoe addressed the finance committee chairman, Andy Dickson, stating that if Mr. Dickson or any member of the finance committee would like to be more involved in the process, Mr. Bledsoe would welcome it.

65. Sheriff Dickson later told Mr. Bledsoe that Dickson was going to stop speaking at Board meetings because other Board members were coordinating with Dickson before meetings, aligning on positions and strategy adversely to Mr. Bledsoe, and then going silent during the meetings themselves, leaving Dickson to advance the group's agenda alone.

66. Further, Mr. Bledsoe called 1st Vice President Sheriff Van Dyke—and later the Interim Executive Director, replacing Mr. Bledsoe—in or around September of 2025 to ask about the secret meetings excluding Bledsoe. All Sheriff Van Dyke responded with was for Mr. Bledsoe "to be on his A game," without discussing any performance concerns.

67. On October 1, 2025, at approximately 2:13 p.m., Mr. Bledsoe returned a call from Board member and Past President Sheriff Jeff Box, following text messages between them. Sheriff Box told Mr. Bledsoe that, at one of the internal meetings from which Mr. Bledsoe had been excluded, a Board member[5] announced a plan to find a new Executive Director to replace him. Sheriff Box stated that he had spoken up on Mr. Bledsoe's behalf, saying there was no need for such action against Bledsoe, and that nothing warranted Mr. Bledsoe's termination.

---

[5] Sheriff Box would not disclose the identity of such Board member.


Case 3:26-cv-01445 Document 1 Filed 10/09/26 Page 16 of 41 PageID #: 16

68. The secret meetings from which Mr. Bledsoe was excluded were deliberations about his own employment, conducted without notice to him and in violation of the Governing Documents.

**F. Mr. Bledsoe's Medical Conditions and Leave**

69. On September 18, 2025, while at work attending a law enforcement graduation at Walters State Community College to speak and present an award, Mr. Bledsoe experienced and was subsequently diagnosed with atrial fibrillation with an elevated heart rate, together with related complications—a physical impairment of the cardiovascular and circulatory systems that requires ongoing medication. Mr. Bledsoe notified Association President Russell Barker and the Association's office staff.

70. Mr. Bledsoe's atrial fibrillation substantially limits the major bodily functions of his cardiovascular and circulatory systems, and substantially limits major life activities including breathing, sleeping, exerting himself, concentrating, and working when active and without regard to the ameliorative effects of medication. *See* 42 U.S.C. § 12102 ("Definition of disability").

71. In or around October of 2025, Mr. Bledsoe contracted COVID-19, which rendered him unable to work. He was on medical leave from on or about October 7, 2025 through the date of his termination and was incapacitated for more than three consecutive full calendar days. During that period, he received treatment from a health care provider on October 7, 2025 and was prescribed medication.

72. Mr. Bledsoe notified TSA of his illness and need for leave on or about October 7, 2025, by phone to President Russell Barker and the Association's office staff. Upon information and belief, TSA's Board members, including those who effected his termination, knew of his COVID-19 illness and medical leave and of his atrial fibrillation diagnosis.

**G. The October 9, 2025 Termination**

73. On October 7, 2025, at 4:00 p.m., Mr. Bledsoe participated by telephone in a meeting of the Board of Directors while on medical leave.

74. On October 9, 2025, a scheduled training date, Board members presented the matter of Mr. Bledsoe's employment to Sheriffs in attendance during a session scheduled from 9:45 a.m. to 10:45 a.m. and titled "TSA Proposed Constitution Amendment," in place of the regularly scheduled meeting. The session was neither noticed, styled, nor conducted as a for-cause termination vote of the general membership under Article XI(D)—which outlines the responsibility of the President of the Association to provide the board recommendation to the general membership for any necessary action.

75. Mr. Bledsoe, who was on medical leave, attempted to join the "TSA Proposed Constitution Amendment" session by telephone, contacting all four executive Board members, including Defendants Barker and Van Dyke, by both telephone and text message. He was not permitted to participate, even though Board members had permitted him to participate by telephone only two days earlier in the Board of Directors meeting.

76. Mr. Bledsoe's staff, who ordinarily took notes at such meetings, in compliance with TSA Bylaws Section 5.7[6], were excluded from the room and barred from taking notes, and that function was reassigned to a Board member. Mr. Bledsoe spoke with his staff members separately, Kaitlyn Williams and Amanda Carleton, for the start of the "TSA Proposed Constitution Amendment" to ensure notes were documented and recorded for the meeting. Mr. Bledsoe asked if his staff members would get someone in the session to let Bledsoe phone in to

[6] Section 5.7 Executive Director: ". . . Minutes of the meetings of the Corporation and the Board of Directors shall be prepared by or at the direction of the Executive Director."

join. Each staff member advised they were removed or not allowed in the meeting room and were afraid to interrupt the meeting.

77. Upon information and belief, those present were told that Mr. Bledsoe had been informed of the meeting, had been given the opportunity to attend, and had chosen not to do so. That representation was false—Mr. Bledsoe attempted to call at least four more sheriffs to see if they were in the meeting, with no answer. Mr. Bledsoe actively attempting to join the meeting at that time was a fact known to at least some of those present, one of whom remarked that Mr. Bledsoe was contacting members to allow Bledsoe to join.

78. Members who wished to hear from Mr. Bledsoe were prevented from doing so, contrary to Robert's Rules of Order, which govern the Association's meetings under Section 4.6 of the Bylaws. Members who spoke with Mr. Bledsoe afterward described the session as unusually protracted and the information presented in support of his termination as confusing.

79. On October 9, 2025, TSA notified Mr. Bledsoe by telephone call, which he recorded, that his employment was terminated, effective October 9, 2025. The call was placed by Association President, Defendant Russell Barker.

80. TSA terminated Mr. Bledsoe while he was on medical leave, less than seven months after the membership unanimously voted to retain him for a two-year term, and less than one month after the Board approved his raise.

**H. TSA Disregarded Every Procedural Safeguard in Its Governing Documents**

81. TSA did not terminate Mr. Bledsoe by a majority vote of the active membership present at a properly noticed meeting of the general membership called for that purpose, as Article XI(D)[7] of the Constitution requires.

---

[7] Article XI - Executive Director, Section D: "The Executive Director may be terminated *for cause* at any meeting of the general membership by a *majority vote* of the active membership present."

82. Section 3.7 of the Bylaws requires that notice of the date, time, and place of each meeting, and, for a special meeting, a description of its purpose, be given no fewer than ten (10) days before the meeting, allowing all members notice of the opportunity to join. Mr. Bledsoe, who, as Executive Director, was responsible for providing such notices to members in compliance with TSA Bylaws Section 5.7(D)[8], received no notice of any meeting at which his employment was to be discussed or acted upon, and no notice describing such a purpose was given to the membership.

83. TSA had no "cause" to terminate Mr. Bledsoe. Section 4.12 of the Bylaws defines "cause" for removal as "final conviction of a felony, declaration of unsound mind by court order, adjudication of bankruptcy, nonacceptance of office, conduct prejudicial to the interest of the corporation, or absence from three (3) or more consecutive meetings of the Board." None of those grounds apply to Mr. Bledsoe.

84. TSA did not follow the disciplinary procedures in Section 3.9 of the Personnel Policy and Procedure Manual, which govern disciplinary action against Association employees. The Board never met with Mr. Bledsoe, never informed him of any alleged cause, and never gave him an opportunity to respond before terminating him.

85. Section 3.9(A) of the Personnel Policy and Procedure Manual identifies twenty-six grounds for disciplinary action, including theft; assault; drunkenness or abuse of medication while on duty; illegal drug use; falsifying agency records; possession of unauthorized weapons; misuse or damage of agency property; gambling on agency property; insubordination; neglect or disobedience of lawful orders; sleeping during working hours; excessive absenteeism or tardiness; failure to perform official duties; conviction of a felony or misdemeanor involving

[8] Section 5.7 Executive Director, Subsection D: "The duties of the Executive Director shall [include]: To coordinate and make arrangements for the meetings of the Corporation and the Board of Directors."

moral turpitude; dishonesty, immoral conduct, and conduct unbecoming an employee; and job abandonment. TSA never charged Mr. Bledsoe with, or identified to him, any of these grounds or any comparable ground for discipline.

86. Section 3.9(B) of the Personnel Policy and Procedure Manual, entitled "Disciplinary Procedures," establishes the procedures that govern disciplinary action against Association employees. It provides that an employee who receives written disciplinary action "shall be given the opportunity to review the written reprimand" and "shall also be given the right to respond in writing to the reprimand," with the response filed in the employee's personnel file. It requires a disciplinary conference that "must be conducted within four (4) days of the offense." It mandates that any disciplinary action "must be supported enough to bear the burden of proof." And it provides that an employee later cleared of a policy violation "will be entitled to have the reprimand removed" from the personnel file, with any lost wages paid retroactively.

87. TSA afforded Mr. Bledsoe none of these protections. He received no written disciplinary action or reprimand, no opportunity to review or respond in writing to any charge, no disciplinary conference, and no proof of any ground for discipline. Upon information and belief, TSA's records reflect no disciplinary action of any kind against Mr. Bledsoe at any time before his termination. TSA thus terminated its Executive Director without the minimum procedural protections its own Manual guarantees to every Association employee who faces discipline.

88. Upon information and belief, TSA also failed to follow the interim-appointment procedures of Article XI(C) of the Constitution after the vacancy it created, and appointed 1st Vice President/Board Member Sheriff Mike Van Dyke as Interim Director.

89. Mr. Bledsoe has requested the meeting minutes and notes reflecting the basis for his termination and has requested a meeting with the Board to discuss it. TSA has not produced the minutes and has not responded to his request for a meeting.

**I. TSA's Stated Reasons Are Pretextual**

90. TSA's stated reasons for the termination, expressed through, but not limited to, a phone call between President Russell Barker and Plaintiff on October 9, 2025, have included (a) the April 2025 termination of the office manager; (b) a tax filing issue; and (c) unspecified "performance concerns."

91. Each stated reason is false or pretextual. The office manager's termination was proper, within Mr. Bledsoe's authority, supported by the then-President and other Board members, and corroborated by the Board-approved forensic examination and forensic audit.

92. The tax filing issue concerned an incorrectly completed IRS Form 990 that originated, in or around 2009, years before Mr. Bledsoe became Executive Director It was addressed at a March 22, 2023 meeting with then-President Sheriff Robert Bryan, attended without prior notice by Sheriffs Eddie Farris and Tim Fuller. Mr. Bledsoe addressed the matter at the next Board meeting, and it was resolved more than two years before his termination without any suggestion that his performance was deficient or his employment in jeopardy.

93. Upon information and belief, certain Board members also made false reports of Bledsoe closing the office during regularly scheduled workdays.

94. The vague "performance concerns" are contradicted by the membership's unanimous March 2025 Vote of Confidence, by the Board's approval of a salary increase for fiscal year 2026, and by the absence of any documented performance concern or disciplinary action.

95. In addition to the vague and pretextual "performance concerns", upon information and belief, certain Board members began assert additional objections against Bledsoe, including (i) the amount of compensation the Board had already approved for Mr. Bledsoe, (ii) the Board's approval of Bledsoe's accommodation to work remotely two days per week, if possible.

96. None of TSA's stated reasons were ever charged, documented, or proven as a ground for disciplinary action under Section 3.9 of the Personnel Policy and Procedure Manual. TSA's abandonment of its own written disciplinary procedures, which would have required it to put its reasons in writing, give Mr. Bledsoe an opportunity to respond, and bear the burden of proof, is further evidence that its stated reasons are pretextual.

97. TSA's shifting, stale, and unsupported justifications, together with its disregard of its own procedures, the timing of the termination during Mr. Bledsoe's medical leave, and the Board's secret coordination, demonstrate that its stated reasons were pretext for unlawful retaliation and discrimination.

**J. Post-Termination Conduct**

98. On or about October 21, 2025, Mr. Bledsoe attempted to return Association property and retrieve his personal belongings from the Association's offices. TSA failed to respond to his communications about the retrieval and, only after he was already en route, asserted for the first time that he was required to schedule an appointment and be accompanied by two specific Sheriffs before entering. Mr. Bledsoe has preserved audio of the telephone call and related text messages. These requirements had not been communicated in response to his prior inquiries, and TSA ultimately did not enforce them.

99. On October 23, 2025, Interim Director/1st Vice President Sheriff Mike Van Dyke came to Mr. Bledsoe's residence to retrieve the Association vehicle. In a text message the day

before, Mr. Bledsoe again requested the documentation underlying his termination and was told only that it was "being worked on."

**K. Damages**

100. As a direct and proximate result of Defendants' conduct, Mr. Bledsoe has suffered and continues to suffer damages including, but not limited to, lost wages and benefits, such as salary, accrued annual and sick leave, and retirement contributions; loss of the value of the remainder of his two-year term; diminished earning capacity; and reputational harm within the specialized law enforcement community in which he has spent his career.

101. As a further direct and proximate result of Defendants' conduct, Mr. Bledsoe has suffered emotional distress, humiliation, and anxiety. During the period of escalating retaliation, Bledsoe met with President Barker at his office on or about September 17, 2025, to discuss TSA business. Some topics included, but were not limited to, the Association's undermining and retaliatory actions towards Mr. Bledsoe in his capacity as Executive Director.

102. The following day, Mr. Bledsoe experienced a medical condition; later, he was diagnosed with atrial fibrillation, attributed in part to the stress of Defendants' conduct, and Mr. Bledsoe has incurred out-of-pocket medical expenses for treatment and prescription medication, as well as other out-of-pocket losses.

103. Defendants acted with malice or with reckless indifference to Mr. Bledsoe's federally protected rights, including by secretly coordinating his removal, falsely representing to the membership that he had declined to attend, terminating him while on medical leave, and disregarding every procedural safeguard in TSA Governing Documents.

104. Pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3), Plaintiff pleads the following claims alternatively and hypothetically, including claims that rest on different causation standards, regardless of consistency.

## VII. CLAIMS FOR RELIEF

### COUNT I
### RETALIATORY DISCHARGE IN VIOLATION OF THE TENNESSEE PUBLIC PROTECTION ACT (Tenn. Code Ann. § 50-1-304) (Against Defendant TSA)

105. Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106. The TPPA provides that no employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities. *See* Tenn. Code Ann. § 50-1-304(b). "Illegal activities" are activities in violation of the criminal or civil code of Tennessee or the United States, or any regulation intended to protect the public health, safety, or welfare. *Id.* § 50-1-304(a)(3).

107. Plaintiff was an employee of TSA, and TSA was his employer, within the meaning of the TPPA.

108. The false certification of attendance at state-mandated law enforcement training and the receipt of undisclosed gifts by public officials, as described above, constitute illegal activities within the meaning of Tenn. Code Ann. § 50-1-304(a)(3), because they violate the criminal and civil code of Tennessee and laws intended to protect the public welfare, including the integrity of law enforcement training records and public funds.

109. Plaintiff refused to remain silent about those illegal activities by reporting them to TSA's Board members and membership, by instituting procedures to prevent false certification, by repeatedly instructing members that no one could sign in on another's behalf, by sending

email correspondence to all 95 counties instructing on this subject, and by arranging and conducting ethics training directed at the conduct.

110. TSA, through its Board members, had knowledge of Plaintiff's refusals to remain silent.

111. TSA terminated Plaintiff's employment on or about October 9, 2025.

112. Plaintiff's refusal to remain silent about illegal activities was the sole reason for his termination. TSA's stated reasons were pretextual, as shown by the temporal sequence of events, the Board's secret coordination, the stale and manufactured nature of its justifications, the contradiction between those justifications and the March 2025 Vote of Confidence and fiscal year 2026 salary increase, and TSA's disregard of its own Governing Documents.

113. As a direct and proximate result of TSA's violation of the TPPA, Plaintiff has suffered the damages described above and is entitled to all remedies available under Tenn. Code Ann. § 50-1-304, including, but not limited to, back pay, front pay, compensatory damages, and costs and attorney's fees to the extent permitted by law.

## COUNT II
## DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW (42 U.S.C. § 1983; U.S. Const. amend. XIV) (Against All Defendants)

114. Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

115. At all relevant times, TSA acted under color of state law because it is pervasively entwined with the State of Tennessee and its political subdivisions, as alleged above. The Individual Defendants likewise acted under color of state law at all relevant times: each is an elected Sheriff and public official who served on TSA's Board of Directors by virtue of that

office, and each exercised the authority of TSA's executive offices in carrying out the conduct alleged herein.

116. Plaintiff had a constitutionally protected property interest in his continued employment as Executive Director. The Governing Documents, including Article XI of the Constitution created a legitimate claim of entitlement to continued employment for the two-year term confirmed by the March 2025 Vote of Confidence, terminable only for cause and only by majority vote of the general membership. *See Bd. of Regents v. Roth*, 408 U.S. 564, 576-577 (1972)(explaining that public employees "dismissed during the terms of their contracts . . . have interests in continued employment that are safeguarded by due process"). That entitlement is reinforced by the mutually explicit understandings reflected in Section 3.9 of the Personnel Policy and Procedure Manual, which conditions discipline of any Association employee on written notice, an opportunity to respond, a conference, and proof.

117. TSA deprived Plaintiff of that property interest without due process of law. Before terminating him, TSA gave Plaintiff no notice of the charges against him, no explanation of its evidence, and no opportunity to respond, and it affirmatively prevented him from participating in the October 9, 2025 session at which his termination was presented. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)(holding that before termination, a public employee with a property interest in continued employment "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story"). TSA has provided no post-termination hearing or other process. Because the deprivation resulted from the deliberate decision of TSA's final decisionmakers, and not from a random and unauthorized act, the availability of post-deprivation state-law remedies does not satisfy due process.

118. Defendant Barker personally participated in the deprivation. Among other things, Barker (a) upon information and belief, led the July 2025 Sheriffs-only meeting at which Mr. Bledsoe's reputation and character were attacked; (b) knew, from Mr. Bledsoe's direct reports to him on September 18 and October 7, 2025, of Mr. Bledsoe's atrial fibrillation diagnosis and medical leave; (c) as one of the four executive Board members Mr. Bledsoe contacted on October 9, 2025, refused to permit Mr. Bledsoe to participate in the session at which his termination was presented; (d) upon information and belief, presented, advanced, or directed the presentation of the termination to the Sheriffs in attendance; and (e) personally informed Mr. Bledsoe by telephone that his employment was terminated and stated the pretextual reasons described above, without having afforded him notice of the charges, an explanation of the evidence, or an opportunity to respond.

119. Defendant Van Dyke personally participated in the deprivation. Among other things, Van Dyke (a) when Mr. Bledsoe asked him in or about September 2025 about the undisclosed meetings from which Mr. Bledsoe was excluded, did not disclose their purpose and told Mr. Bledsoe only "to be on his A game"; (b) as one of the four executive Board members Mr. Bledsoe contacted on October 9, 2025, refused to permit Mr. Bledsoe to participate in the session at which his termination was presented; (c) upon information and belief, participated in, advanced, and supported the termination; and (d) accepted appointment as TSA's Interim Executive Director, the position from which Mr. Bledsoe had been removed.

120. The Individual Defendants knew that Mr. Bledsoe could be terminated only for cause, by a majority vote of the active membership present at a properly noticed meeting of the general membership, and that he was entitled to notice of the charges against him and an opportunity to respond, yet they deliberately deprived him of that process. The right of a public

employee with a property interest in continued employment to pre-termination notice, an explanation of the evidence, and an opportunity to respond was clearly established at all relevant times.

121. As to TSA, The decision to terminate Plaintiff was made by TSA's Board of Directors and executive officers, including, but not limited to, the Individual Defendants, who possess final policymaking authority for TSA with respect to the employment of the Executive Director. The deprivation therefore resulted from TSA's own policy and decision.

122. As a direct and proximate result, Plaintiff has suffered the damages described above. Plaintiff is entitled to, *inter alia*, compensatory damages, punitive damages, equitable relief including reinstatement, and attorney's fees and costs under 42 U.S.C. § 1988.

**COUNT III**
**DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12112) (Against Defendant TSA)**

123. Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

124. Plaintiff is an individual with a disability within the meaning of 42 U.S.C. § 12102(1). His atrial fibrillation is a physical impairment that substantially limits the major bodily functions of his cardiovascular and circulatory systems and other major life activities, and TSA knew of it.

125. In the alternative, TSA regarded Plaintiff as having a disability within the meaning of 42 U.S.C. § 12102(1)(C) and (3)(A), in that it terminated him because of his actual or perceived physical impairments, including his atrial fibrillation and his COVID-19 illness and its effects. Plaintiff's atrial fibrillation is neither transitory nor minor.

126. Plaintiff was qualified for the Executive Director position and could perform its essential functions, with or without reasonable accommodation, as demonstrated by his years of service and the unanimous March 2025 Vote of Confidence.

127. TSA terminated Plaintiff on the basis of disability, while he was on medical leave and within weeks of his atrial fibrillation diagnosis, in violation of 42 U.S.C. § 12112(a). Plaintiff's disability was a but-for cause of his termination, and Defendant's stated reasons are pretextual.

128. TSA also failed to engage in the interactive process or provide the reasonable accommodation of medical leave and a fair opportunity to respond, and instead terminated Plaintiff during that leave. *See* 42 U.S.C. § 12112(b)(5)(A).

129. TSA acted with malice or reckless indifference to Plaintiff's federally protected rights.

130. Plaintiff is entitled to, *inter alia*, back pay, front pay or reinstatement, compensatory and punitive damages subject to 42 U.S.C. § 1981a, and attorney's fees and costs under 42 U.S.C. § 12205.

## COUNT IV
## RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12203) (Against Defendant TSA)

131. Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

132. Plaintiff engaged in activity protected by the ADA by requesting and taking medical leave as an accommodation for his medical conditions.

133. TSA knew of Plaintiff's protected activity.

134. TSA took materially adverse action against Plaintiff by terminating his employment during that leave.

135. A causal connection exists between Plaintiff's protected activity and his termination, as shown by the very close temporal proximity between his leave and his termination and by TSA's pretextual justifications.

136. Plaintiff is entitled to, *inter alia*, the relief available under 42 U.S.C. §§ 12203(c) and 12117(a).

**COUNT V**
**DISABILITY DISCRIMINATION IN VIOLATION OF THE TENNESSEE DISABILITY ACT (Tenn. Code Ann. § 8-50-103) (Against Defendant TSA)**

137. Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

138. The TDA prohibits discrimination in the discharge of any person based solely upon any physical, mental, or visual disability of the applicant or employee, unless the disability to some degree prevents the employee from performing the duties required by the employment or impairs the performance of the work involved. *See* Tenn. Code Ann. § 8-50-103(b).

139. Plaintiff has a physical disability, including atrial fibrillation, and was regarded by TSA as having a disability. His conditions did not prevent him from performing the duties of Executive Director.

140. TSA terminated Plaintiff based upon his disability, in violation of the TDA.

141. As a direct and proximate result, Plaintiff has suffered the damages described above. Plaintiff is entitled to, *inter alia*, back pay, front pay, compensatory damages for emotional distress and humiliation, and attorney's fees and costs.

## COUNT VI
## RETALIATION IN VIOLATION OF TITLE VII (42 U.S.C. § 2000e-3(a)) (Against Defendant TSA)

142. Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

143. Plaintiff engaged in activity protected by Title VII's opposition clause when he opposed the office manager's display of sexually explicit material in the workplace, which he reasonably and in good faith believed constituted sex-based harassment unlawful under Title VII, and when he terminated the office manager and commissioned the forensic examination in response.

144. TSA, through its Board members, knew of Plaintiff's protected activity.

145. TSA subjected Plaintiff to materially adverse actions, including exclusion from meetings concerning his own employment, public confrontations, a secret meeting convened to attack his reputation, and the termination of his employment.

146. Plaintiff's protected activity was a but-for cause of those adverse actions. The campaign against Plaintiff began immediately after and focused on the office manager's termination, Board members convened a Sheriffs-only meeting about that termination from which Plaintiff was excluded, and TSA cited the office manager's termination as a reason for terminating Plaintiff.

147. TSA acted with malice or reckless indifference to Plaintiff's federally protected rights.

148. Plaintiff is entitled to, *inter alia*, back pay, front pay or reinstatement, compensatory and punitive damages subject to 42 U.S.C. § 1981a, and attorney's fees and costs under 42 U.S.C. § 2000e-5(k).

**COUNT VII**
**RETALIATION IN VIOLATION OF THE TENNESSEE HUMAN RIGHTS ACT (Tenn. Code Ann. § 4-21-301(a)) (Against Defendant TSA)**

149. Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

150. The THRA makes it a discriminatory practice to retaliate or discriminate in any manner against a person because that person has opposed a practice declared discriminatory by the THRA. *See* Tenn. Code Ann. § 4-21-301(a). Sex-based harassment is a discriminatory practice under the THRA. *See* Tenn. Code Ann. § 4-21-401.

151. For the reasons stated in Count VI, TSA retaliated against Plaintiff and terminated him because Plaintiff opposed sex-based harassment in the workplace.

152. Plaintiff is entitled to, *inter alia*, back pay, front pay or reinstatement, compensatory damages for emotional distress, embarrassment, and humiliation, and attorney's fees and costs. *See* Tenn. Code Ann. §§ 4-21-306, 4-21-311(b).

**COUNT VIII**
**BREACH OF CONTRACT (Against Defendant TSA)**

153. Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

154. A valid and enforceable contract existed between Plaintiff and TSA, consisting of the provisions of the Governing Documents incorporated into or governing the terms of Plaintiff's employment, including, but not limited to, the Constitution (including, but not limited to, Article XI), the Bylaws (including, but not limited to, Sections 3.7 and 4.12), and the Personnel Policy and Procedure Manual (including, but not limited to, Section 3.9).

155. Under that contract, Plaintiff was entitled to continued employment as Executive Director for the two-year term confirmed by the March 2025 Vote of Confidence, subject to termination only for cause and only by majority vote of the active membership present at a meeting of the general membership, called on proper notice.

156. Plaintiff fully performed his obligations under the contract.

157. TSA materially breached the contract by terminating Plaintiff without cause; without a vote of the general membership under Article XI(D); without the notice required by Section 3.7 of the Bylaws; and without following the disciplinary procedures of Section 3.9(B) of the Personnel Policy and Procedure Manual, which required written notice of the alleged grounds, an opportunity to review and respond in writing, a disciplinary conference, and proof sufficient to bear the burden of proof.

158. TSA also breached the implied covenant of good faith and fair dealing inherent in every Tennessee contract by secretly coordinating Plaintiff's removal, misrepresenting to the membership that he had declined to participate, and labeling a non-termination session a "Proposed Constitution Amendment" to evade the requirements of Article XI(D).

159. As a direct and proximate result of TSA's breach, Plaintiff has suffered damages including the compensation and benefits he would have received for the remainder of his two-year term, through approximately March 2027, in an amount to be proven at trial, together with prejudgment interest. Section 3.9(B) of the Personnel Policy and Procedure Manual further provides that an employee cleared of an alleged violation is entitled to retroactive payment of lost wages.

**COUNT IX**
**PROMISSORY ESTOPPEL (Pleaded in the Alternative) (Against Defendant TSA)**

160. Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

161. This count is pleaded in the alternative to Count VIII, to the extent the Court determines that no enforceable contract governed Plaintiff's employment.

162. TSA, through its Constitution, Bylaws, the Personnel Policy and Procedure Manual, and representations made in hiring Plaintiff, promised that the Executive Director would be terminated only for cause and only by majority vote of the general membership, and, through the March 2025 Vote of Confidence, promised Plaintiff an additional two-year term.

163. TSA reasonably should have expected those promises to induce Plaintiff's action, and they did: Plaintiff retired from his elected office as Sheriff to accept the Executive Director position and remained in that position in reliance on those protections.

164. Plaintiff's reliance was reasonable and to his detriment, and injustice can be avoided only by enforcing the promises.

165. Plaintiff is entitled to damages in an amount to be proven at trial.

**COUNT X**

**INDUCEMENT OF BREACH OF CONTRACT (Tenn. Code Ann. § 47-50-109 and Tennessee Common Law) (Against Defendants Barker and Van Dyke)**

166. Plaintiff incorporates by reference paragraphs 1 through 104 of this Complaint as if fully set forth herein.

167. Tenn. Code Ann. § 47-50-109 provides that "[i]t is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto," and that "the

person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract." *See* Tenn. Code Ann. § 47-50-109. Tennessee common law likewise recognizes the tort of inducement or procurement of breach of contract, which the statute codifies.

168. To establish inducement of breach of contract, a plaintiff must show (1) a legal contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intent to induce its breach; (4) that the wrongdoer acted maliciously; (5) a breach of the contract; (6) that the act complained of was the proximate cause of the breach; and (7) resulting damages. *See* New Life Corp. of Am. v. Thomas Nelson, Inc., 932 S.W.2d 921, 926 (Tenn. Ct. App. 1996).

169. As alleged in Count VIII, a valid and enforceable contract existed between Plaintiff and TSA, under which Plaintiff was entitled to continued employment as Executive Director for the two-year term confirmed by the March 2025 Vote of Confidence, subject to termination only for cause, by majority vote of the active membership present at a properly noticed meeting of the general membership, and in accordance with the Governing Documents and the disciplinary procedures of the Personnel Policy and Procedure Manual.

170. Each Individual Defendant knew of that contract and its terms. As members of TSA's Board of Directors and as its executive officers, Barker and Van Dyke were familiar with and bound by the Governing Documents, including Article XI of the Constitution; were members of the Association when it conducted the March 2025 Vote of Confidence; and served on the Board that approved Mr. Bledsoe's fiscal year 2026 salary increase.

171. Each Individual Defendant intended to induce TSA to breach the contract and did induce and procure that breach. Among other things, the Individual Defendants (a) upon information and belief, participated in undisclosed Board meetings, held in violation of the

Bylaws and without notice to Mr. Bledsoe, at which his removal was planned; (b) upon information and belief, coordinated with other Board members before Board meetings to advance positions adverse to Mr. Bledsoe; (c) as two of the four executive Board members, refused Mr. Bledsoe's requests to participate in the October 9, 2025 session; (d) upon information and belief, caused his termination to be presented to the Sheriffs in attendance at a session labeled "TSA Proposed Constitution Amendment," rather than at a properly noticed meeting of the general membership; and (e) in Barker's case, personally communicated the termination to Mr. Bledsoe and, in Van Dyke's case, assumed the position of Interim Executive Director.

172. The Individual Defendants acted maliciously, intentionally, and without legal justification. They did not act within the scope of any authority conferred on them by TSA, because the Governing Documents vest the authority to terminate the Executive Director exclusively in the general membership, by majority vote of the active membership present, and only for cause. By procuring Mr. Bledsoe's termination outside that process, through undisclosed meetings and a misrepresentation to the membership that Mr. Bledsoe had declined to participate, the Individual Defendants acted outside the scope of their authority as directors and officers of TSA.

173. Upon information and belief, the Individual Defendants also acted for personal motives rather than to further TSA's legitimate interests, including personal hostility toward Mr. Bledsoe arising from his refusal to remain silent about misconduct by Sheriffs and Board members and his enforcement of Association standards against them; objections to the compensation the Board had approved for him; and, in Van Dyke's case, his own advancement to the position of Executive Director.

174. TSA breached the contract by terminating Plaintiff, as alleged in Count VIII, and the Individual Defendants' conduct was the proximate cause of that breach.

175. As a direct and proximate result, Plaintiff has suffered damages, including the compensation and benefits he would have received for the remainder of his two-year term and the other damages described above. Plaintiff is entitled to treble damages against the Individual Defendants under Tenn. Code Ann. § 47-50-109 or, in the alternative, compensatory and punitive damages under Tennessee common law, because the Individual Defendants acted intentionally, maliciously, and recklessly.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jeff Bledsoe respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

A. A declaration that TSA's conduct violated the TPPA, 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment, the ADA, the TDA, Title VII, and the THRA, and breached its contract with Plaintiff;

B. A declaration that the Individual Defendants' conduct violated 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment, and Tenn. Code Ann. § 47-50-109;

C. Reinstatement against TSA to the position of Executive Director with full seniority and benefits or, in the alternative, front pay in lieu of reinstatement;

D. Back pay, lost benefits, and other lost compensation from the date of termination through the date of judgment, with prejudgment interest;

E. Compensatory damages for emotional distress, humiliation, embarrassment, reputational harm, loss of earning capacity, and out-of-pocket losses including

medical expenses, under the ADA, Title VII, § 1983, the TPPA, the TDA, the THRA, and Tennessee common law;

F. Punitive damages under the ADA, Title VII, and 42 U.S.C. § 1983, to the extent permitted by law, in an amount sufficient to punish Defendants and deter similar conduct;

G. Contract damages, including the compensation and benefits due for the remainder of Plaintiff's term, or, in the alternative, damages for promissory estoppel;

H. Treble damages against the Individual Defendants under Tenn. Code Ann. § 47-50-109 or, in the alternative, compensatory and punitive damages against them under Tennessee common law;

I. Reasonable attorney's fees, expert fees, and costs under 42 U.S.C. §§ 1988, 2000e-5(k), and 12205, Tenn. Code Ann. §§ 4-21-311 and 50-1-304, and other applicable law;

J. An award to offset any adverse tax consequences of a lump-sum recovery;

K. Pre-judgment and post-judgment interest at the maximum rate allowed by law; and

L. Such other and further legal and equitable relief to which Plaintiff may be entitled.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 8th day of October, 2026.

Respectfully submitted,

_/s/ *Jimmie B. Strong*_
Jimmie B. Strong (BPR #033916)
THE ADVISORY, PLLC
5100 Poplar Avenue, Suite 2700
Memphis, Tennessee 38137
P: (901) 286-1767
jstrong@theadvisory.global
*Attorney for Plaintiff*

## EXHIBIT 1

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Nashville Area Office**
220 Athens Way, Suite 350
Nashville, TN 37228
(629) 236-2240
Website: www.eeoc.gov

### DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 08/18/2026

**To:** Mr. Jeff Bledsoe
1049 Polly Willey Road
Dickson, TN 37055

Charge No: 494-2026-04631

EEOC Representative and email: WILLIAM REYNOLDS
INVESTIGATOR SUPPORT ASSISTANT
WILLIAM.REYNOLDS@EEOC.GOV

---

### DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 494-2026-04631.

On behalf of the Commission,

Digitally Signed By:PHILLIP BORNEFELD
08/18/2026

PHILLIP BORNEFELD
AREA OFFICE DIRECTOR